1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11

PEDRO ZAMBRANO GONZALEZ,

Case No.   1:22-cv-00271-KES-HBK (HC)

12

Petitioner,

13

v.

FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY [1]

14

RON GODWIN,

15

Respondent.

FOURTEEN-DAY OBJECTION PERIOD

16
17
18

## I.    STATUS

19

Petitioner Pedro Zambrano Gonzalez ("Petitioner" or "Gonzalez"), a state prisoner, is

20

proceeding pro se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on

21

February 28, 2022.  (Doc. No. 1, "Petition").  Petitioner challenges his convictions following a

22

jury trial for (1) attempted murder in violation of Penal Code §§ 664 and 187(a); (2) torture in

23

violation of Penal Code § 206; (3) robbery in violation of Penal Code § 212.5(c); (4) false

24

imprisonment with violence in violation of Penal Code § 236; (5) carrying a loaded, unregistered

25

firearm in violation of Penal Code § 25850(a) and (c); and (6) possession of an assault weapon in

26

violation of Penal Code § 30605, with additional findings that Petitioner personally and

27
28

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

1  intentionally discharged a firearm, proximately causing great bodily injury.  (Case No.

2  BF169031A).  (Doc. No. 20-18 at 2; *see* Doc. No. 20-2 at 72-90).[2]  The Kern County Superior

3  Court sentenced Petitioner to a total unstayed term of eight years four months plus twenty-five

4  years to life.  (Doc. No. 20-18 at 2; Doc. No. 20-2 at 110).  On appeal, the Fifth Appellate District

5  Court affirmed.  (Case No. F077427).  (Doc. No. 20-18 at 2).  On December 29, 2020, the

6  California Supreme Court summarily denied review.  (Case No. S265437).  (Doc. No. 20-20).

7       The Petition presents two grounds for relief: (1) there was insufficient evidence to support

8  the torture conviction because there was no evidence to support the great bodily injury element,

9  and (2) Petitioner received ineffective assistance of counsel, specifically with respect to counsel's

10  failure to move to suppress evidence from a vehicle search.  (*See generally* Doc. No. 1 at 10-14).

11  Respondent filed an Answer (Doc. No. 19) and lodged the state court record in support (Doc.

12  Nos. 20, 20-1 through 20-20), arguing Petitioner was not entitled to relief on either ground.

13  Petitioner failed to file a reply and the deadline to do so has long since expired.  This matter is

14  deemed submitted on the record before the Court.  After careful review of the record and

15  applicable law, the undersigned recommends the district court deny Petitioner relief on both

16  grounds of his Petition and decline to issue a certificate of appealability.

17  **II.    GOVERNING LEGAL PRINCIPLES**

18  **A.    Evidentiary Hearing**

19       In deciding whether to grant an evidentiary hearing, a federal court must consider whether

20  such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

21  would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474

22  (2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise

23  precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id*.  Here,

24  the state courts adjudicated both of Petitioner's claims on the merits.  This Court finds that the

25  pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary

26  hearing is required.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

27

28  [2] All citations to the pleadings and record are to the page number as it appears on the Case Management and Electronic Case Filing ("CM/ECF") system.

1

**B.    ADEPA General Principles**

2      A federal court's statutory authority to issue habeas corpus relief for persons in state

3  custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

4  Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

5  first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

6  the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

7  of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

8  the merits, then AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*,

9  136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a

10  claim adjudicated on the merits, but only if the adjudication:

11
12

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or

13
14

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

15  28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

16  *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

17      "Clearly established federal law" consists of the governing legal principles in the

18  decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

19  U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

20  unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

21  to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

22  governing law set forth by Supreme Court case law; or (2) reached a different result from the

23  Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

24  12, 16 (2003).

25      A state court decision involves an "unreasonable application" of the Supreme Court's

26  precedents if the state court correctly identifies the governing legal principle, but applies it to the

27  facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

28  133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

1    [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

2    extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362,

3    407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas

4    relief so long as fair-minded jurists could disagree on the correctness of the state court's

5    decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the

6    state court decision "was so lacking in justification that there was an error well understood and

7    comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

8        When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

9    State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

10   the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt*

11   *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

12   merely because the federal habeas court would have reached a different conclusion in the first

13   instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

14       Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

15   constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.*

16   *Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of

17   AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-

18   prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas

19   petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable

20   precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.

21   112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails

22   to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has

23   cleared both tests." *Id*. at 134.

24       As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

25   an "adjudication on the merits" in state court. An adjudication on the merits does not require that

26   there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

27   at 98. "When a federal claim has been presented to a state court and the state court has denied

28   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

4

of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

## III.    RELEVANT FACTUAL BACKGROUND

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

### I

### JULY 6, 2017

#### A.    Discovery of the Victim

> Late at night on July 6, a member of the housekeeping staff at Mercy Hospital in downtown Bakersfield was on a break near the ambulance bay, when she heard tires screeching. A car fishtailed into the ambulance bay, then someone said, "[G]et him out of my car" or "[G]et out of my car." The passenger door was flung open and a man was shoved out onto the street. When the housekeeper reached him, she saw he was bleeding heavily. He kept grabbing for the side of his head and saying he was shot. The housekeeper ran into the emergency room to get help.

5

The injured man was Michael R.  He was suffering from multiple gunshot  wounds.  He had injuries to his head, knees, shoulder, foot, and ankle.  As of the time of trial, he had scars on the back, top, and side of his head.  He was told that two bullets grazed his head, while the other head injuries were from an object.  It took approximately 17 staples to close the head wounds.  He was shot in the shoulder, and the bullet  remained in his body as of the time of trial.  There were three bullet wounds in each knee, and he had a lot of glass cuts to, and glass still in, both knees.  Two bullets went through his left ankle, necessitating surgery to insert metal plates.  It took Michael four and a half to five months to walk again, and he would never be able to run.  The pain was "[t]remendous."  As of trial, he was still in constant pain.

**B.**     **Michael's Trial Testimony**

Michael met Jose Z. one time. He did not know Jose's brother — defendant —although he knew of him. He had never seen defendant outside of court proceedings.

Sometime prior to July 6, a woman borrowed $1,200 from Jose, but gave it to Michael to hold. Michael was supposed to take it to a bail bond agent for someone else.

The shooting occurred at a house in the 1200 block of 3rd Street in Bakersfield. Michael's car had been stolen, and he had put up a reward for it. A girl he knew said that if he went to that house, the people there knew the girl who had stolen the car and could get her to come over to the house. Michael had been to the house once before. There were always several people there. Michael spoke to defendant by phone just before going to the house. He did not recall what defendant said, but "assume[d]" the conversation was about the stolen car.

When Michael arrived at the house, neither Jose nor defendant was there. When Michael went inside, two men entered behind him. He immediately knew something was wrong. He reached for the door handle so he could leave and was struck in the back of the head with a small pistol — possibly .22-caliber — by a Black male. The other person was an overweight Hispanic male called "Gordo." Michael was unable to get through the screen door, then the gun was in his face and the man holding the gun told him to sit down. Michael sat on the couch in the living room. This was the only gun he saw at that point, but later, he saw a third man with a gun. This person, who was already inside the house, was not defendant. Michael did not recognize him.

Gordo tied Michael's legs with an Ethernet cable or extension cord, while the Black man held the gun to Michael's face. The men asked Michael to empty his pockets. Michael gave up everything in his pockets, which was about $2,200 to $2,500 in cash. Meanwhile, the third man was going around the house, grabbing items and putting them in a backpack.

6

Michael asked if there was anything else he could give them to make them let him go. He took out his cell phone and said he could call and have any amount of money there that they wanted. Gordo took the phone and threw it. Michael gave them a diamond ring worth about $15,000, and proposed they take it and let him go.

Michael believed he was tied up for about 15 minutes. He thought he was conscious the entire time, but there were "blur spots" he did not remember. He thought he tried to get away. Somehow, he ended up between the living room and the kitchen, with the Black man hitting him in the head with a guitar while Michael was on the ground with his legs tied. The third person pulled a larger gun out of the backpack. Michael believed it was a .40- or .45-caliber Glock. It was a black semiautomatic with a white sight and a big barrel.

The third time the Black man struck Michael with the guitar, the instrument hit Michael in the mouth and broke in half. The man with the Glock was "doing his own thing" and not paying attention. When he got too close to Michael, Michael tried to grab the gun, and he and the other men ended up in a "dog pile" with Michael on top of one of the men and underneath the other two. Michael bit the third person's hand to get the Glock.

After that, they "[f]ought back and forth with hands." There was a lot of blood. When Michael got the gun, the clip was ejected. He pushed the clip back in and tried to pull the slide back to chamber a round so he could shoot, but it was too slimy from blood. Michael did not know if he had been shot by then, but he felt blood coming down the side of his head. The Black man fired at him "point blank" while they were in the dog pile.

At some point, Michael got under the table and then made his way to the sliding glass door in the kitchen. He did not recall that part, or how the person with the backpack ended up with the Glock again. The sliding glass door was locked, so Michael tried to break it with something. He could feel himself getting shot by the Black man with the smaller gun. The man with the Glock shot him in the ankle. Michael did not know which round went through the glass door, but the glass shattered. He was fairly sure the Glock was fired twice.

Michael tried to stand, but his ankle would not hold his weight, causing him to fall back down on top of the glass. He pushed the glass out and crawled across it into the back or side yard. His legs were still tied. Once he got outside, the only way to free his legs was to take off his pants. Once he did that, he crawled to the gate in the fence, only to find it also was locked. He managed to pull himself to the top of the six- to eight-foot fence, then flipped himself over and crawled another 45 feet or so to where the car that had brought him to the house was waiting. The driver took him to a hospital, from which he was transferred to Kern Medical Center (KMC).

At one point while he was at KMC, Michael thought his father was

with him, but it was Bakersfield Police Detective Pair. Michael told Pair what happened and that it could have been defendant who inflicted the injuries. The identification was based on an assumption as to whom Michael was supposed to meet at the house. Michael did not really recall what occurred while he was being treated. He told Pair that defendant was Jose's brother, and that the house where everything happened was on 3rd Street. Michael did not recall Pair showing him a photographic lineup.

Michael was certain the third person was not defendant. Michael was not afraid of defendant or Jose. He had no reason to be. He identified defendant at the preliminary hearing on July 28, but Pair threatened him. He did not recall what he said at the preliminary hearing.

### C.      Law Enforcement and Related Testimony

At approximately 10:00 p.m. on July 6, Bakersfield Police Officer Hamma responded to Mercy Hospital regarding a report of an assault with a deadly weapon. When he arrived, he was informed the victim was being transported to KMC for treatment. Hamma then followed the ambulance to KMC. Once Michael was taken out of the ambulance, Hamma asked who assaulted him. Michael responded that it was "Pedro," Jose's brother. He also gave what he believed to be their last name and where they lived on 3rd Street. Michael said he had gone there, and they tied him up and took his money. Pedro took his phone and shattered it. Pedro shot him. Michael described Pedro, and said "Gordo" and a Black man Michael did not know were involved. After, they took off running. At no time during the conversation did Michael appear uncertain as to who shot him. During the conversation, he lapsed in and out of consciousness or sleep at least once.

Bakersfield Police Officer Hardin also spoke with Michael at KMC. Michael said "Pedro" had done this to him. He did not give a last name. He said Pedro kicked him in the face, and identified Pedro, possibly Gordo, and a Black man as the ones involved in the incident. Michael said he had borrowed money from Jose to help another friend, and they took well over $1,200 from him that night. Pedro kept saying that he had told Michael to have the money ready. Michael kept telling him that he had the money in his pocket, but "[t]hey still only wanted to do is . . . tie [Michael] up and fuck [him] up."

Bakersfield Police Officers Celedon and Jauch responded to the 1200 block of 3rd Street to attempt to locate the crime scene. Celedon observed a trail of what appeared to be dried blood leading from the sidewalk up the driveway of a house to the east portion of the fence that led to the rear yard. Jauch obtained a key from a neighbor, allowing the officers to gain entry through the chained security door at the front of the house. Inside, there was damage throughout the house, including a shattered sliding glass door in the kitchen from which a chain was hanging and away from which the blood trail led. There was also fresh, wet blood on the floors of the living room and kitchen. Officers did not find anyone inside.

Officers obtained a search warrant and reentered the house approximately 30 to 45 minutes later. Among items seized in the search were blood samples, two spent .45- caliber shell casings, a bullet fragment, a cell phone, and a cracked guitar with dried blood on the bottom. The guitar weighed an estimated 10 to 15 pounds. A pair of bloodstained jeans was found in the area of the fence. DNA results showed Michael could not be excluded as the source of the blood on the guitar and found elsewhere at the scene.

Pair interviewed Michael at KMC on the afternoon of July 7. During the interview, Michael looked disheveled and was writhing in pain, although he was coherent. Pair explained that he wanted to show Michael some pictures, to see if Michael could identify the person responsible. When Pair asked if Michael felt he was in the right state of mind to be able to do that, Michael answered affirmatively. He said the person who did it was named Pedro. Shown a photographic lineup, Michael said number one looked like him the most, but "fatter." Michael agreed with Pair's interpretation that he was saying if number one was skinnier, it would be Pedro. Michael said he knew him "real well." Defendant was in the number one position in the photographic lineup.

Pair related some of Michael's testimony at the preliminary hearing. At that hearing, Michael said he believed his life was in danger. Defendant and Jose had control over him, and he had been threatened by men sent by defendant to collect the debt owed by Michael to defendant and Jose. Michael contacted defendant before going to the house on 3rd Street on July 6. At the preliminary hearing, Michael identified defendant and said he was at the house when Michael arrived. Defendant gave the order to tie Michael's legs and held a "Glock-40" to Michael's head. Defendant reached into Michael's pockets and took his money. Michael described defendant as being angry during the incident at the house. Defendant said he had already sent two people for the money, and he was upset about the length of time it took for payment. Defendant said he also owed people money and was being threatened for it. Defendant took Michael's cell phone, threw it, and shot Michael twice in the leg. Defendant was not aiming at the leg; he was aiming at Michael and hit him in the leg. Michael also testified at the preliminary hearing that the photograph in the number one position was the one of the six photographs that was most like defendant. The photograph was not recent enough for Michael to be positive, because defendant was a lot skinnier now.

## II

## JULY 12, 2017

At approximately 2:00 a.m. on July 12, Bakersfield Police Officers Glenn and Schinler drove their respective patrol vehicles into the parking lot of the Vagabond Inn on Panama Lane, just east of Freeway 99. As Glenn entered the parking lot, he saw a car immediately exit the lot and leave the area at a high rate of speed. The officers followed the car onto the freeway, then, when it exited,

Schinler made a traffic enforcement stop.

Before the officers approached the vehicle, Glenn noticed some fidgeting on the driver's side. He could see the silhouette of two heads inside the car. The driver's head was going down and up as if he was picking something up or putting something down. As Schinler approached the driver side door, Glenn observed the driver, subsequently identified as defendant, start to take his hands from the steering wheel and go underneath the seat. Glenn ordered him to put his hands back on the steering wheel.

Schinler obtained the names of the vehicle's occupants. Both were subject to outstanding warrants. They were taken into custody and placed in officers' vehicles. A search of the car revealed a .45-caliber ACP handgun, containing nine live rounds, under the driver's seat and an AK-47-type assault rifle with a detached magazine, containing 26 live rounds, in a guitar case in the trunk. Neither gun was registered.

DNA analysis showed neither defendant nor Michael could be excluded as sources of the DNA obtained from the .45-caliber handgun. Michael was excluded as a possible contributor to the DNA obtained from the AK-47, while defendant could not be excluded. Firearm testing showed the spent cartridge casings found at the crime scene were fired by the .45-caliber pistol. The firearm examiner was unable to determine whether the bullet fragment came from that firearm, although the fact it was copper jacketed rather than copper washed made it more consistent with being a .45-caliber round than .22-caliber round.

(Doc. No. 20-18 at 3-10 (footnotes omitted)).

## IV.    ANALYSIS

Respondent acknowledges that Petitioner's grounds for relief were raised on direct appeal to the Fifth Appellate District Court, denied on the merits (Doc. No. 20-18), then subsequently raised to, and summarily denied by the California Supreme Court (Doc. No. 20-20).  Thus, both grounds are exhausted, and the Court looks to the Fifth Appellate District's reasoned decision in evaluating each of Petitioner's claims under the deferential standard of review.  *Wilson*, 138 S. Ct. at 1192.

### A.    Ground One-Sufficiency of the Evidence

In his first ground, Petitioner argues there was insufficient evidence to support his torture conviction because the evidence of great bodily injury was linked to the firearm being discharged, "which was totally independent of when the alleged torture took place."  (Doc. No. 1 at 10).

*////*

10

1          **1.  State Court Decision**

2          In denying Petitioner's insufficiency claim on direct review, the Fifth Appellate District

3    court found as follows:

4                        <u>SUFFICIENCY OF THE EVIDENCE</u>

5          Defendant contends the evidence is insufficient to sustain his
     conviction for torture (count 2). We conclude otherwise.
6

7          The test of sufficiency of the evidence is whether, reviewing the
     whole record in the light most favorable to the judgment below,
8    substantial evidence is disclosed such that a reasonable trier of fact
     could find the essential elements of the crime beyond a reasonable
9    doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord,
     *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence
10   is that evidence which is "reasonable, credible, and of solid value."
     (*People v. Johnson*, *supra*, at p. 578.) An appellate court must
11   "presume in support of the judgment the existence of every fact the
     trier could reasonably deduce from the evidence." (*People v. Reilly*
12   (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the
     evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise
13   the credibility of the witnesses, or resolve factual conflicts, as these
     are functions reserved for the trier of fact (*In re Frederick G.* (1979)
14   96 Cal.App.3d 353, 367). "If the circumstances reasonably justify
     the [trier of fact's] findings, reversal is not warranted merely
15   because the circumstances might also be reasonably reconciled with
     a contrary finding. [Citations.]" (*People v. Redmond* (1969) 71
16   Cal.2d 745, 755.) Instead, reversal is warranted only if "it appears
     'that upon no hypothesis whatever is there sufficient substantial
17   evidence to support [the conviction].' [Citation.]" (*People v. Bolin*
     (1998) 18 Cal.4th 297, 331.) This standard of review is applicable
18   regardless of whether the prosecution relies primarily on direct or
     on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th
19   1107, 1125.)

20         Section 206 provides, in pertinent part: "Every person who, with
     the intent to cause cruel or extreme pain and suffering for the
21   purpose of revenge, extortion, persuasion, or for any sadistic
     purpose, inflicts great bodily injury as defined in Section 12022.7
22   upon the person of another, is guilty of torture." Torture thus "has
     two elements: (1) the infliction of great bodily injury; and (2) the
23   specific intent to cause cruel or extreme pain and suffering for the
     purpose of revenge, extortion, persuasion, or for any sadistic
24   purpose. [Citation.]" (*People v. Massie* (2006) 142 Cal.App.4th
     365, 370-371.)

25         Defendant first contends the evidence failed to establish he inflicted
     great bodily injury during the alleged torture. Defendant argues
26   there were two discreet assaults on Michael, the first when he was
     held captive and was hit, kicked, and struck with a guitar; and the
27   second when he was shot while trying to escape. Because only the
     shooting resulted in great bodily injury, the argument runs, the great
28   bodily injury did not occur during the alleged torture.

1

2    Great bodily injury, as defined in section 12022.7, "means a significant or substantial physical injury." (§ 12022.7, subd. (f).) It

3    is injury that is "not insignificant, trivial, or moderate. [Citation.]" (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.) " 'Abrasions, lacerations and bruising can constitute great bodily

4    injury. [Citation.]' " (*People v. Hale* (1999) 75 Cal.App.4th 94, 108.)

5

6    Torture can be committed by a course of conduct. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1429.) When such is the case, "it is not necessary that any single act in the course of conduct

7    results in great bodily injury. Rather, if the requisite intent exists and the cumulative result of the course of conduct is great bodily

8    injury, the crime of torture has been committed. [Citation.]" (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1043; accord, *People*

9    *v. Hamlin*, *supra*, at p. 1429.) Moreover, "[t]he statutory definition of torture does not require a direct use of touching, physical force,

10    or violence, but instead is satisfied if the defendant, *directly or indirectly*, inflicts great bodily injury on the victim." (*People v.*

11    *Lewis* (2004) 120 Cal.App.4th 882, 888, italics added.) In other words, a defendant can be convicted of torture as an aider and

12    abettor. (*Id.* at p. 889.) "Section 206's reference to section 12022.7 . . . does not give defendant an opening to argue that section 206

13    requires defendant to have personally inflicted the torture in the same way that section 12022.7 requires there be personal infliction

14    of injury for the statute to operate." (*Id.* at pp. 888-889, fns. omitted.)

15

16    In the present case, there was evidence of blood in the immediate entryway of the residence, substantiating Michael's testimony that

17    he was hit in the head as soon as he entered. Michael testified at the preliminary hearing that defendant gave the order to tie his legs. A

18    reasonable inference can be drawn from Michael's trial testimony that he was already bleeding badly by the time of the struggle over

19    the larger caliber firearm. Celedon estimated the guitar, with which Michael had been struck in the head, was heavy, weighing 10 to 15

20    pounds. Jurors were shown photographs of Michael's injuries, and were instructed on aiding and abetting principles.

21    In light of the foregoing, jurors reasonably could have concluded the torture in this case was committed by a course of conduct, and

22    that defendant inflicted great bodily injury during the torture, either as a direct perpetrator or an aider and abettor. The fact the trial

23    court, in denying defendant's section 1118.1 motion, appears to have agreed with defendant that great bodily injury was not

24    inflicted until the struggle over the gun, is immaterial. The question for the trial court in ruling on the motion was " ' "simply whether

25    the prosecution ha[d] presented sufficient evidence to present the matter to the jury for its determination." [Citation.]' " (*People v.*

26    *Dalton* (2019) 7 Cal.5th 166, 249.) The jury was in no way bound by the trial court's reasoning. "[D]etermining whether a victim has

27    suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by

28    the jury. [Citations.] ' "A fine line can divide an injury from being

1    significant or substantial from an injury that does not quite meet the
     description." ' [Citations.] Where to draw that line is for the jury to
2    decide." (*People v. Cross* (2008) 45 Cal.4th 58, 64.)

3        . . .

4        Substantial evidence supports defendant's conviction of torture.

5    (Doc. No. 20-18 at 10-14 (footnotes omitted)).[3]

6            **2.  Federal Habeas Analysis**

7        At the outset, Petitioner does not explain how the state court's rejection of this claim was

8    unreasonable or based on an unreasonable determination of the facts.  In evaluating this claim, the

9    undersigned reviews the state court's reasoned decision under the deferential standard of review

10   applying clearly established federal law.

11       The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from

12   conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the

13   crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  The federal standard

14   for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v.*

15   *Virginia*, 443 U.S. 307 (1979).  Under *Jackson*, "the relevant question is whether, after viewing

16   the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

17   found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319 (emphasis in

18   original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under

19   *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare

20   rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the jury's

21   verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed

22   with the jury").

23       The *Jackson* standard "must be applied with explicit reference to the substantive elements

24   of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*,

25   408 F.3d 1262, 1275-76 (9th Cir. 2005).  The reviewing court should look to state law for the

26   ───────────────

27   [3] The state appellate court also analyzed whether there was sufficient evidence to support the
     requisite intent for the torture conviction.  (*See* Doc. No. 20-18 at 13-14).  However, because
     Petitioner does not challenge the intent element in his Petition, this Court need not discuss this
28   element further.

                                        13

1   elements of the offense and then turn to the federal question of whether any rational trier of fact

2   could have found the essential elements of the crime supported by sufficient evidence beyond a

3   reasonable doubt.  *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

4        Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed

5   under a "twice-deferential standard."  *Parker v. Matthews*, 567 U.S. 37, 43 (2012).  As noted by

6   the Supreme Court:

7

8        First, on direct appeal, "it is the responsibility of the jury−not the
         court−to decide what conclusions should be drawn from evidence
         admitted at trial. A reviewing court may set aside the jury's verdict

9        on the ground of insufficient evidence only if no rational trier of
         fact could have agreed with the jury." And second, on habeas

10       review, "a federal court may not overturn a state court decision
         rejecting a sufficiency of the evidence challenge simply because the

11       federal court disagrees with the state court. The federal court
         instead may do so only if the state court decision was 'objectively

12       unreasonable.' "

13  *Coleman*, 566 U.S. at 651.

14       Under California law, torture is committed when an individual, "with the intent to cause

15  cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any

16  sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of

17  another."  Cal. Penal Code § 206.  "'[G]reat bodily injury' means a significant or substantial

18  physical injury."  Cal. Penal Code § 12022.7(f)(1).  While the severity of the injury is relevant, it

19  is not necessarily determinative and there is no requirement that the injury be permanent,

20  disabling, or disfiguring.  *People v. Massie*, 142 Cal. App. 4th 365, 371 (Cal. Ct. App. 2006);

21  *People v. Pre*, 117 Ca. App. 4th 413, 420 (Cal. Ct. App. 2004).

22       Here, the state appellate court applied the *Jackson* test and determined there was sufficient

23  evidence to support the Petitioner's torture conviction as defined by California law.  Petitioner

24  renews the same argument he raised to the state appellate court—that because the only evidence

25  of bodily injury was connected to the gunshot wounds, rather than any other cause, it was

26  insufficient to support the separate torture conviction.  (Doc. No. 1 at 10-11).  However,

27  Petitioner wholly fails to explain how the state court's rejection of this claim was not contrary to,

28  or an unreasonable application of, clearly established Supreme Court precedent.  (*See generally*

1    Doc. No. 1 at 10-11).  Nor does Petitioner claim that the state court's factual findings were

2    unreasonable.

3         A review of the record reveals that sufficient trial evidence supported Petitioner's torture

4    conviction.  The victim testified that he suffered injuries to his head, knees, shoulder, foot, and

5    ankle, but not all of these injuries were from gunshot wounds.  (Doc. No. 20-5 at 29).  The victim

6    specifically testified that one of his head wounds was from an object.  (*Id.*).  Later, as he was

7    describing the events of the night in question, he testified that he was hit in the back of the head

8    with a small pistol, his legs were bound, and he was hit in the head again with a guitar with

9    enough force to break the guitar.  (*Id.* at 46-47, 49, 53, 56-57).  Officer Andrew Celedon, who

10   recovered the guitar from the home during a search, testified that the guitar weighed between ten

11   to fifteen pounds and had blood on it. (Doc. No. 20-6 at 85-86, 88).  DNA testing determined the

12   blood on the guitar belonged to the victim.  (Doc. No. 20-7 at 114-15).

13        Viewing the evidence in the light most favorable to the prosecution and even without

14   considering the evidence related to the gunshot wounds, a rational trier of fact could have found

15   beyond a reasonable doubt that the victim suffered great bodily injury from the hits to his head

16   from the pistol and guitar.  As such, the state court's rejection of Petitioner's sufficiency of the

17   evidence claim was not contrary to, or an unreasonable application of, clearly established

18   Supreme Court precedent, nor was it based on an unreasonable determination of the facts.  The

19   undersigned recommends that ground one be denied.

20        **B.    Ground Two-Ineffective Assistance of Counsel**

21        In his second ground, Petitioner argues he received ineffective assistance of counsel

22   because his trial counsel failed to challenge the admission of the firearms evidence based on an

23   allegedly illegal search.  (Doc. No. 1 at 11-12).  Petitioner argues "[t]he search of the closed

24   container in the trunk was not a valid search incident to arrest, cannot be justified under the good

25   faith, inevitable discovery, automobile, community caretaking, or inventory search exceptions to

26   the exclusionary rule."  (*Id.* at 13).

27        **1.    State Court Decision**

28        In denying Petitioner's ineffective assistance claim on direct review, the Fifth Appellate

District court found as follows:

### INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends his trial attorney's performance was constitutionally defective with respect to count 7, because counsel failed to move to suppress the AK-47 found following defendant's arrest. Defendant concedes the vehicle stop, arrest, and search of the passenger compartment of the vehicle were lawful. He argues, however, that the warrantless search of the trunk, which included opening the closed guitar case, was unlawful. We conclude defendant has failed to establish ineffective assistance of counsel.

The applicable law is settled. The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

"To make a showing of constitutionally inadequate representation by counsel when failure to seek suppression of evidence on a Fourth Amendment ground is asserted as the basis for the ineffective counsel claim, the party must establish that the Fourth Amendment claim had merit and that it is reasonably probable that a different verdict would have been rendered had the evidence been excluded. [Citations.]" (*People v. Coddington* (2000) 23 Cal.4th 529, 652, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1107, fn. 4 & overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

The parties discuss whether the search and opening of the guitar case could be justified as a search incident to arrest and/or on the basis of probable cause to believe there was contraband or evidence of a crime inside the vehicle. (See, e.g., *Arizona v. Gant* (2009) 556 U.S. 332, 335, 347; *People v. Lee* (2019) 40 Cal.App.5th 853, 861.) Glenn testified he and Schinler were conducting an inventory search, because the vehicle was going to be towed.

Because defendant had been arrested, Glenn and Schinler had authority under state law to impound the vehicle. (*People v. Redd* (2010) 48 Cal.4th 691, 721; see Veh. Code, § 22651, subd. (h)(1).) Having decided to impound the vehicle, the officers had authority

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

to conduct an inventory of the vehicle's contents " 'aimed at securing or protecting the car and its contents.' [Citation.]" (*People v. Redd*, *supra*, at p. 721, fn. omitted; see *Colorado v. Bertine* (1987) 479 U.S. 367, 381; *South Dakota v. Opperman* (1976) 428 U.S. 364, 368-369; *People v. Zavala* (2018) 19 Cal.App.5th 335, 340.) In order to be reasonable under the Fourth Amendment, however, such a search and the opening of any containers cannot be a pretext for an investigatory purpose and must adhere to preexisting policy or practices. (*Florida v. Wells* (1990) 495 U.S. 1, 4-5; *People v. Zabala*, *supra*, 19 Cal.App.5th at p. 341; *People v. Wallace* (2017) 15 Cal.App.5th 82, 90.)

Here, no evidence was presented at trial concerning the existence of, or conduct of the search pursuant to, any preexisting policy or procedures. From this, defendant concludes there is a reasonable probability that had his trial attorney brought a suppression motion, the AK-47 assault rifle would have been suppressed; hence, his conviction on count 7 must be reversed.

We disagree. While, when a defendant has sought suppression of evidence, the prosecution bears the burden of demonstrating a legal justification for a warrantless search, which is presumed to be unreasonable under the Fourth Amendment (*People v. Simon* (2016) 1 Cal.5th 98, 120), defendant's claim here is ineffective assistance of counsel. On that, as we have said, defendant bears the burden. (*People v. Pope*, *supra*, 23 Cal.3d at p. 425.)

We cannot tell, from the record on appeal, whether a suppression motion would have had merit. Evidence concerning the existence of any standardized criteria for inventory searches would have been irrelevant at trial, since the search was never challenged.

"If the record contains no explanation for [counsel's] challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

Because the record on appeal does not show why the search was never challenged, defendant is not entitled to reversal on direct appeal unless counsel simply could have had no satisfactory explanation for failing to bring a suppression motion. No such finding can be made; for all the record before us shows, counsel knew the police department had the required standard criteria and policy, and the officers acted pursuant thereto so that a motion inevitably would have failed. "Counsel is not ineffective for failing to make a frivolous motion." (*People v. Weaver* (2001) 26 Cal.4th 876, 931.)

17

1
2
> Based on the record before us, we can ascertain neither deficient performance nor prejudice. Accordingly, defendant has failed to bear his burden of establishing ineffective assistance of counsel.

3     (Doc. No. 20-18 at 14-17 (footnote omitted)).

4                    **2.  Federal Habeas Analysis**

5           As an initial matter, the Court must clarify the scope of Petitioner's ineffective assistance

6     claim.  Despite specifically indicating that he is "[n]ot challenging the procedure in which the

7     firearms were discovered is the basis of Petitioner's ineffective assistance claim," Petitioner also

8     references trial counsel's failure to object to testimony from the victim and investigating officer

9     and makes a general plea that the Court "consider trial counsel's representation as a whole when

10    considering trial strategy[,] tactical decisions and ultimately effective representation."  (Doc. No.

11    1 at 12-13).  However, a petitioner challenging counsel's performance "must identify the acts or

12    omissions of counsel that are alleged not to have been the result of reasonable professional

13    judgment." *Strickland v. Washington*, 466 U.S. 668, 690 (1984).  Thus, Petitioner cannot assert a

14    general challenge to counsel's conduct.  With respect to trial counsel's failure to object to

15    testimony from the victim and investigating officer, Petitioner did not raise these claims to the

16    state court such that they are unexhausted.  Accordingly, the Court construes the ground two as

17    asserting a single ineffective assistance claim based on counsel's failure to challenge the firearm

18    evidence discovered in the vehicle.

19          Criminal defendants have a right to counsel at trial and on direct appeal.  U.S. Const.

20    Amend VI.  Claims alleging that trial or appellate counsel were constitutionally ineffective

21    require the Court to engage in the two-step analysis set forth in *Strickland v. Washington*, 466

22    U.S. 668 (1984).  Under the first prong of that test, the petitioner must prove that his attorney's

23    representation fell below an objective standard of reasonableness.  *Id*. at 687-88.  To demonstrate

24    deficient performance, the petitioner must show his counsel "made errors so serious that counsel

25    was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*. at

26    687; *Williams v. Taylor*, 529 U.S. 362, 391 (2000).  In reviewing trial counsel's performance,

27    however, "counsel is strongly presumed to have rendered adequate assistance and made all

28

1    significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at

2    690; *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).  Only if counsel's acts and omissions,

3    examined within the context of all the circumstances, were outside the "wide range" of

4    professionally competent assistance, will petitioner meet this initial burden.  *Kimmelman v.*

5    *Morrison*, 477 U.S. 365, 386 (1986); *Strickland*, 466 U.S. at 689-90.

6          Under the second part of *Strickland's* two-prong test, the petitioner must show that he was

7    prejudiced by counsel's conduct.  466 U.S. at 694.  Prejudice is found where there is a reasonable

8    probability that, but for his counsel's errors, the result would have been different.  *Id*.  The errors

9    must not merely undermine confidence in the outcome of the trial but must result in a proceeding

10   that was fundamentally unfair.  *Williams*, 529 U.S. at 393 n.17; *Lockhart v. Fretwell*, 506 U.S.

11   364, 372 (1993).  The petitioner must prove both prongs:  deficient performance and prejudice.  A

12   court need not, however, determine whether counsel's performance was deficient before

13   determining whether the petitioner suffered prejudice as the result of the alleged deficiencies.

14   *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of

15   lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

16          Petitioner once again fails to explain how the state court's rejection of his ineffective

17   assistance claim was unreasonable or based on an unreasonable determination of the facts.  The

18   state court correctly identified and applied the two-prong *Strickland* analysis in disposing of

19   Petitioner's claim.  In assessing counsel's performance, the state court found there was no

20   evidence to support that counsel should have challenged the inventory search, which is generally

21   permissible under the Fourth Amendments so long as it conducted consistent with standard

22   procedures and is not "a ruse for general rummaging in order to discover incriminating evidence."

23   *Florida v. Wells*, 495 U.S. 1, 4 (1990).  As the state court recognized, in the absence of any

24   evidence to the contrary, the decision not to challenge the search may have been based on

25   counsel's knowledge of the relevant police department's policies and practices concerning

26   inventory searches and counsel's belief that the search here was proper.  Counsel had no duty to

27   make a frivolous motion.  *Polk Cnty. v. Dodson*, 454 U.S. 312, 324 (1981) ("It is the obligation of

28   any lawyer—whether privately retained or publicly appointed—not to clog the courts with

1    frivolous motions or appeals.").  Thus, Petitioner's claim fails on the deficiency prong.  Further,

2    Petitioner mistakenly presumes if deficiency is shown he is automatically entitled to habeas relief.

3    Even if Petitioner could prevail on the deficiency prong, he fails to address, yet alone

4    demonstrate, the prejudice prong.

5        Thus, the state court's rejection of Petitioner's ineffective assistance of counsel claim

6    based on counsel's failure to move to suppress the firearm evidence was not contrary to, or an

7    unreasonable application of, clearly established Supreme Court precedent, nor was it based on an

8    unreasonable determination of the facts.  The undersigned recommends that ground two be

9    denied.

10        **V.  CERTIFICATE OF APPEALABIILTY**

11        A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

12    court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

13    *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

14    district court to issue or deny a certificate of appealability when entering a final order adverse to a

15    petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

16    Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

17    showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

18    the petitioner to show that "jurists of reason could disagree with the district court's resolution of

19    his constitutional claims or that jurists could conclude the issues presented are adequate to

20    deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

21    *McDaniel*, 529 U.S. 473, 484 (2000).  Because Petitioner has not made a substantial showing of

22    the denial of a constitutional right, the undersigned recommends that the court decline to issue a

23    certificate of appealability.

24        Accordingly, it is **RECOMMENDED**:

25        1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

26            1); and

27        2.  Petitioner be denied a certificate of appealability.

28        ////

1

**NOTICE TO PARTIES**

2          These Findings and Recommendations will be submitted to the United States District

3    Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

4    after being served with a copy of these Findings and Recommendations, a party may file written

5    objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

6    "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

7    **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

8    wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

9    CM/ECF document and page number, when possible, or otherwise reference the exhibit with

10    specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

11    the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

12    636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

13    waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

14

15    Dated:   __February 28, 2025__                     *Helena M. Barch-Kuchta*

16                                                     HELENA M. BARCH-KUCHTA
                                                     UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28